The next argument is in Appeal No. 05-3205, Bradley v. Department of Homeland Security. In this case, we believe that the Administrative Judge determined his theory of the case and excluded any evidence that did not go along with that theory. Mr. Bradley contends that a series of errors were made and decisions made by the Administrative Judge individually and cumulatively constituted an abuse of discretion or arbitrary prejudice and denied him effective due process. I know that the testimony of two other agents that he proffered was excluded. That's true. Why is that an abuse of discretion? Mr. Bradley contended from the beginning that the reason he didn't give this question and answer affidavit was that the IA, Internal Affairs, had a pattern of turning on and off the tape recorder depending upon what IA wanted to have as a record. Both of these gentlemen excluded would have said the same thing. Wait a minute. How does that create a problem for Agent Bradley? If part of the interview was not recorded because the tape recorder was turned off and he later answers the written questions, if the questions deal with something not on the recording, then there's no danger to him that he would contradict himself because the only recital about that transaction will be in the written answers. Not in any tape. So how is he prejudiced by the fact that the tape was turned off? Your Honor, it's simple. If he had answered the same questions in writing and the tape did not include part of the answer that he would have given in writing, then he would have been subject to disciplinary action. That's the part I don't understand. If he gave version A in a tape-recorded oral interview and later gave a materially different account of the same transaction in written answers to questions, then there would be a conflict between the tape and the written answers, and maybe the conflict would be somehow used as the foundation of an assertion of misconduct. But if the tape is missing that transaction and it's only described in the written interview, then there can't be any conflict. In the absence of a conflict, how is there any problem for Mr. Bradley? He saw it as putting him in the position, are you lying now or were you lying then? Because, quote, failure of candor. Why didn't you put it on the tape when you put it in writing? And we contend all along that they were after Agent Bradley. I'm just trying to understand why the testimony of the two agents would be of any relevance. They would, as I understand it, have corroborated Bradley's assertion that sometimes the tape is turned off. But even so, I don't see how that would prove anything of any value to Mr. Bradley. They also testified in an offer that was made that when they went to write their answers, they were given copies or allowed to listen to the tape. Well, I didn't see that Mr. Bradley requested to hear the tape before he gave written answers. I understood him to simply say, I'm not willing to give the written answer. So I don't understand how the cooperation afforded the other two agents has any relevance to Mr. Bradley's case because, as far as I can tell, he never asked to hear his tape. The problem was, Your Honor, at the very beginning, he asked to have a recording of the interview. That was denied. So at that point, since he wouldn't have his own recording, he merely assumed that they weren't going to let him listen to the tape. If he didn't ask for the tape and the agency didn't deny him an opportunity to review, to hear the tape, or have a copy of the tape, then how does he have any basis to complain of some unfairness because he didn't have the tape? He didn't have the tape and he was precluded from asking those questions. He was precluded from asking for a copy of the tape? I don't understand how that could be so. At the time of the oral interview, his attorney, not myself, but his attorney had asked to be allowed to either take or to get a copy and was denied that. So, that having happened, Mr. Bradley is interviewed under oath and then goes on and is told to write the same answers. That's where he made the decision, ostensibly, not to, it would have been worthless to ask to hear the tape. They weren't allowing him any latitude in that area at all. I think a more critical issue here was the fact that Mr. Bradley had actually given four previous statements, including the tape one under oath. Well, I thought we were on the subject of evidence being excluded, you say wrongly and prejudicially, by the AJ. So, I asked first about the two agents whose testimony was excluded. Is there some other testimony or document that you feel was wrongly excluded in a way that made the hearing somehow a mockery or totally unfair or something? Yes, Your Honor. The underlying incident was still being investigated, that we found out after the fact. What else was excluded that denied him a fair hearing in front of the administrative judge? That's what I'm trying to understand. What else was excluded? You talked about the two other agents, the Brown and the other, but what else was excluded that prejudiced Bradley? We were not permitted to see the entire chapter from which they quoted a small portion. That chapter would have, we believe, given parameters to how the investigations were to take place. This is a discovery issue. This doesn't have to do with excluded testimony. This has to do with the scope of discovery. That's correct, Your Honor. That was evidence we didn't have. You were given parts of the chapter, but not every page in the chapter. That's a public document, though. Excuse me? That's a public document. No, it's not. It's an internal case. Are you referring to the regulation? Excuse me? Are you referring to Section 37 of the regulation? No, I'm referring to the handbook that was used, that was in the original evidence file, which is Chapter 3. I'm sorry. I thought you were talking about the CFR. The regulation is there, and for brevity, I'm not going to, at this point, address the handbook. I think that's been covered in my brief. The other big issue, however, is that Mr. Bradley, in fact, cooperated. He was not charged with insubordination or delay or anything else. He was charged with failing to cooperate. He answered each and every question asked to him under oath and on tape. He had provided a statement to Miami Homicide, which was verified by him as true and complete, on tape. He had provided two statements, one the night of the incident and one the next day, about what had happened. At some point, there's got to be a limit. And the thing is that— You may have quite a strong argument when you couch it, as you do at some point. If the agency was reinterviewing your client for the tenth time on tape, under oath, and asking exactly the same question, that might strike at least me as questionable, if not abusive. But that doesn't seem to be even close to the facts we have here. As I understand it, we have essentially two major inquiries by the agency. One, an oral interview on tape, and then later a 29-question document that he was asked to respond to, and he refused. He refused to answer the 29 questions in that second inquiry, as I'm calling it. So we don't seem to have repetition that could be viewed, at least by me, as abusive. We have an oral interview, followed by a request to answer written questions under oath, and he refuses. I don't see that there's any room to argue that, in that context, we have some sort of abusive repetition by the agency. Your Honor, I think that it is given the testimony of the two agents that had interviewed him. The first agent, Mr. Dayton, was present, by the way, at the Miami homicide interview. Mr. Dayton said that they knew pretty much what had happened. So in questioning, I said, well, what didn't you know? He indicated the details. Well, what details didn't you know? What would you have asked? The 29 questions, which were exactly the same. When Mr. Perez testified, he stated— How do we know that the 29 written questions were all fully covered in the oral interview? Because Mr. Bradley told exactly what he knew. No, no, no, stick with me. I thought you said that the 29 written questions had all been fully answered in the oral interview. Correct. So my question to you is, how are we to verify that that is true? That was admitted by opposing counsel, that they were the exact same questions. Mr. Bradley stated at the end of his interview on tape that he had been truthful, he had been complete in his answers. There was nothing else he wanted to add. Well, whether he wants to add something or not doesn't seem to me to be the important thing. The important thing is whether the agency has anything further to ask. Now, if the 29 questions have all been answered, and any related questions occurring to the interviewing agents had also been answered, and therefore the written document is 100% repetitive, you might have some argument. I couldn't see from the materials we were given that the written questions had all been fully explored in the taped interview. I don't think there's any way for us to prove that. Mr. Bradley said his answers were complete, he was truthful, and there were no other details. He also submitted an affidavit on his own later on, which covered the details. Yeah, but the agency's right to ask an employee questions can't be diminished, I wouldn't think, by the fact that spontaneously the employee has given an affidavit, given an interview, written it up in hand, or any other sort of communication. The agency has the right to ask pertinent questions, whether or not there's been a spontaneous or voluntary submission of some sort of memo or account by the employee. Wouldn't you agree with that? No, Your Honor, I think there's a time at which it stops. Mr. Bradley, in training as a special agent, was trained... ...as a result of my conduct in that incident, I can write up a memo and say, this memo contains everything I know about the incident. Now, under your argument, unless I misunderstand it, at that point the agency would be precluded from interviewing him at all, period. No, I'm not saying that, Your Honor. I'm saying that the series of things, it wasn't just one interview. It was a series of statements and documents. I'm trying to test your proposition that because he had volunteered one or more written descriptions of the incident, that somehow that eliminates the agency's right to ask him questions. The agency had the right to ask him questions and did ask him questions. If you look at the 29 questions that were asked, probably 80 to 90% of those were things that wouldn't change. His name, his social security number, his age, whether he was under the influence of any drugs. Those things would not change. Nobody articulated any details that they thought they were missing. The IA agents that were taking the statements did not ask any other questions. They were merely looking for him to impeach himself. Well, your suggestion is that it was a perjury trap, in effect. It had the strong potential, yes. But, of course, the difference between a perjury trap and a test to determine whether somebody is truth-telling because they either do or, in the case of some non-truth-tellers, don't tell the same story in two separate settings, is in the eye of the beholder, typically. It is not an unfamiliar law enforcement technique to go back to people and ask them similar or the same questions and see if they give the same answers. If they don't, it gives you a pretty red flag that there's a problem. So what's wrong with that? This is a serious case. This person died. So what's wrong with going back a second time and saying, let's see what you have to say in writing and let's compare that with what you said in your oral session? If there's a disparity, we'll focus in on that and see where the truth lies. In a vacuum, you're correct. This wasn't in a vacuum. This had the other statements. This had a thorough investigation by another police department. It had all the questions answered. Nobody articulated anything that he was inconsistent with. And I see my time is up. I'll answer your questions. All right. Thank you. Mr. D'Alessandris? Thank you, Your Honors. And may it please the Court, the opinion of the Merit Systems Protection Board should be affirmed as it was not arbitrary nor capricious, was not an abuse of discretion. It was supported by substantial evidence. Well, we know the standard of review. There's really no benefit whatsoever to just reciting that. We all know that. We all agree that's the law. The question is, under the facts of this case, is there a problem or not? No, Your Honor. The undisputed evidence shows that the conduct that Mr. Bradley was charged with occurred. He admits that he refused to— That's not relevant. The argument being made by opposing counsel is that the hearing in front of the administrative judge was unfair because of the exclusion of some documents and some testimony, and that the conduct during the inquiries by the investigators for the agency was repetitive and abusive and ill-motivated. So what's your answer on those particular arguments as she's made them? Certainly, Your Honor. In response to the allegations that relevant evidence was excluded or affected the discovery disputes, these simply did not involve similarly situated individuals. What was the dissimilarity? Those men were investigated. They were questioned. The tape was used. The tape was on some of the time, off some of the time. And the issue being explored seemed to be the practice of having the tape off some of the time. It sounds like, so far, it's exactly the same situation. Well, Your Honor, they were only able to testify as to the fact of investigation in general by the Internal Affairs Department. They did not have specific information regarding Mr. Bradley's situation. No, no, no. But they knew of the use of the tape for their own interviews, did they not? I believe they did, but I believe they were also— I thought that was the proper, that they would testify that when they were the target of an investigation and they were interviewed, that the tape was turned off, including at times where substantive information was being given. Now, I don't know if it's true or not. It doesn't even matter whether it's true or not. That was the proper. Why wouldn't that have been relevant testimony? Your Honor, I don't see how that would influence the underlying question that Mr. Bradley did not cooperate with the Internal Affairs investigation. It's admitted that he did not provide the written declaration after he was requested to provide it and ordered to provide it. Yeah, but his contention seems to be that the investigating agents were engaged in some sort of improper conduct, part of which was turning off the tape recording when it should have been on. And the two excluded agents would have talked about how the tape recording was turned off during their interviews in like fashion when it should have been on. Your Honor, the merit system is protected. That has no relevance to the case? I don't understand the relevance of it, Your Honor. And as you correctly pointed out— What would the reason be for turning off the tape recording if substantive answers about the incident under inquiry are being given? The whole point of having the tape on is so you get the man's answer. If you turn the tape off for part of his answer, you're creating a false record because you capture some of his sentences and you exclude other sentences. That sounds very suspicious to me. Your Honor, there's conflicting evidence in the record. There was testimony by witnesses that the tape recorder was only turned off when Mr. Bradley was reviewing documents or left the room. Well, if that's the truth, then presumably the agents who testified to the contrary would be disbelieved by the administrative judge, fact finder, credibility assessor. Fine. That's what fact finders are supposed to do. The only issue is whether that evidence should have been before the fact finder. Right, Your Honor. However, the administrative judge found that even if that had been entered into evidence, that it couldn't have changed the ultimate question of whether or not Mr. Bradley cooperated with the internal affairs investigation. And he cited to the regulation, which says that if there's an internal affairs investigation, you have to cooperate with it. You have to respond to questions whether oral or written. Even if the investigation is being conducted in an unprofessional way? I don't know that it's in the record that it's conducted in an unprofessional way. Well, of course it's not in the record. The record is what she was trying to create by calling witnesses. And she wasn't permitted to present those two particular witnesses. I'm just trying to test with you whether the witnesses should have been allowed to testify. They could have been disbelieved. Maybe the relevance was not huge. I don't know, but it's not clear on the face of it that their testimony would have utterly nothing to do with Bradley's testimony. Because his version, as I understand it, is that the tape recording in his case was turned off at inappropriate times. And they would have been corroborative witnesses, presumably, because they would have said, I believe, that during their interviews, the tape was also turned off at inappropriate times. Not times when documents were being reviewed and there was silence in the room, but during part of their substantive answers. That would have corroborated Bradley. That would seem quite relevant. But again, Your Honor, it doesn't go to the ultimate question of whether or not he cooperated with the internal affairs investigation. What exactly was his testimony about the events relating to the turning off and on of the tape? I know it was cut off by the administrative judge at one point. But what is the substance of his testimony of proper with respect to that issue? How it was handled in his particular case, setting aside the other two people. I believe that he testified that they had turned it off and on in various points during his testimony. Do you have the place in that? I thought he testified that they turned it off when he was criticizing higher ranking people, and that his criticism was part of his answer. And therefore, he was objecting that half of his answer was being censored out of the record because the tape recorder was turned off during the time he was giving that portion of his answer. Is that not roughly what he said? I believe that was part of the allegation, Your Honor. But again, Your Honor, the regulation provides that the employee is required to respond to the questions of the internal affairs investigators. Do you have the page site that Judge Bryson asked you about? No, I wasn't able to locate it, Your Honor, on the fly. Well, I think your argument is correct, that if we agree with the administrative judge that the outcome in no way could be affected by the acceptance or rejection of the testimony of the two other agents, that then we would have to say, well, even if it was error to exclude it, it was harmless there. But you probably should have a fallback argument in case we don't agree with you that it could have no effect on the outcome and therefore, at most, would be harmless there. Yes, Your Honor. As I was starting to say, the facts are that these proposed witnesses only could testify as to the general question of having been investigated by internal affairs. They were different investigators during different periods. They weren't exactly similarly situated to Mr. Bradley. They didn't have any direct knowledge of the investigators in the case or the information regarding the treatment of an individual who refused to provide an affidavit. They were just generally saying that internal affairs investigators may turn the tape on and off. It wasn't direct evidence responding to this point. Where do we find the proper of what the two excluded agents would have said had they been allowed to testify? I believe, Your Honor, that was just in the administrative judge's order and summary on the pre-hearing conference. I believe that's 70 to 74, if I'm correct. Well, normally the proper is made by the proponent of the testimony. That would be counsel here. And then it would be ruled on by the administrative judge. Normally, it isn't stated by the judge. It's stated by the proposing counsel. Correct, Your Honor. I'm not sure if that document is in the appendix. Well, if we don't have the proper, how can we decide whether the proper was wrongly rejected by the administrative judge? Your Honor, I would go by the evidence of record in the judge's statement of what was proffered. And if that was incorrect or inaccurate, Mr. Bradley's counsel would have presumably notified the judge and made issue of that. This is an issue over a proper. Don't you think that both attorneys would have an obligation to put the proper in the appendix so we could look at it? Your Honor, I overlook that point. I mean, you could say, well, it really is her obligation more than yours. But somebody ought to be giving us the relevant documents. And if the one side fails to, you would think the other side would do it. Yes, Your Honor. It's impossible to tell whether the administrative judge was right in rejecting a proper unless you see the proper itself. Maybe the proper is a little different from what the administrative judge said it is. Your Honor, it can't be determined from the record before the court. What about Chapter 3? How many pages is Chapter 3? I don't know the answer to that question, Your Honor. As I understand it, the agency said it's too burdensome to give him a Xerox of the entire Chapter 3. So we'll select the pages that we think are relevant. We'll Xerox them, but we won't Xerox the rest. I don't believe there was any allegation that it was burdensome. It was law enforcement privileged information, Your Honor. And the agency produced the relevant portions of Chapter 3 but refused to produce the entire chapter claiming law enforcement privilege on that document. And I do not believe that the portion was produced in discovery, but I do not believe it was in the administrative record. The part that was produced? I don't believe so. Can you help us correlate the 29 written questions to the substance of the tape-recorded interview? Your Honor, the agency stipulated that they were the same questions. Exactly? I believe the stipulation said they were exactly the same questions. So no question was a new question. Every one of the 29 questions was a repeat of what had been asked orally? Yes, Your Honor. And the tape-recorded interview was under oath? Yes, Your Honor. So it didn't need to be confirmed in writing to get it under oath. It was already under oath. Correct, Your Honor. And it didn't need to be repeated in order to have a verbatim record. You already had a verbatim record. They had a record, yes. Of his testimony at that point in time. Could you explain to me what the need is to have the same question answered later in writing? Your Honor, it gives the witness a chance to reflect. Sometimes they'll answer a question and then afterwards, upon reflection, they'll realize there was an additional fact that they had forgotten to mention or recall an additional point. Well, if he came forward and said, look at you investigators, when I answered this question before, I forgot part of my recollection about it. I forgot to tell you all that I know, so I want to come back and expand on my answer. That would be quite logical to say, well, by all means, let's have a second round of questioning because you have something to add. That's not the fact here. He didn't come back and want to add anything. They wanted him, the investigators, wanted him to repeat it. Yes, Your Honor. Now, perhaps you can say, well, I agree with Judge Bryson. It's a check of veracity to ask the same question to a witness at a later time. And maybe that's an adequate explanation, but in view of your concession that it's the exact same questions he was asked orally, it's not entirely clear to me why the agency thought it was so important to get the same answers in just the form of a written Q&A document when they already had the case. Well, first of all, it was the agency. There was testimony in the record and cited by the administrative judge that it was the agency's procedure to do this in all cases to follow up the oral interview with a written affidavit. And, Your Honor, when you're asked a question, frequently when I'm walking back to my office from this courthouse, I think that's how I should have answered this question that one of the judges posed. Yeah, yeah, but that goes back to what I said. If the witness wants to come back and have a follow-up interview, of course it should be allowed. Of course it has a purpose. Of course it's logical. But where it's the agency that wants to repeat, that particular rationale doesn't fit. There is the other rationale that Judge Bryson articulated. Well, no, Your Honor. I think that in most cases the witnesses aren't going to come back and say, oh, by the way, I want to go back and be re-interviewed under oath. It's a chance for them to allow them to reflect briefly on the questions they gave and test their veracities and give them a chance to verify whether they've thought of new facts that they forgot during the oral testimony and to test their veracities. Well, you're putting a very charitable coloration on it, but it's certainly the case that we're setting aside the testing for falsehood aspect of questioning. Again, with the same questions, there is also a lock them into their story aspect, which is why people have depositions. And this is in the form of both a written set of interrogatories and a deposition. And if later, presumably if he decides there's a further inquiry into this matter and decides to add something, then this gives the agency a mechanism for saying, you had two chances to tell that story before. One in the oral interview and another at the leisure of being in your office or your home to write out long answers as much as you wanted. You didn't tell this particular new twist. That perhaps is another explanation for why they would ask a couple of questions. It could be used in that manner, Your Honor. Is it your assertion that the agency procedures require that the investigators always have the follow-up written Q&A? Your Honor, I don't know the answer to that question, whether it was the agency's procedure. There was testimony from the special agent in charge that that was the way they had done all of their investigations in that office. I would assume it's consistent with agency procedure. So it's a practice, whether or not it's required by written policy. Yes, Your Honor. All right, fair enough. Thank you very much. Thank you, Your Honor. Ms. Glucksman, you have a little rebuttal time? Briefly, Your Honor. That was similarly situated. They're pretending it was a standard operating procedure to ask for the written affidavit after the oral interview. We were saying it's standard operations for them to turn the tape on and off. As far as your question about the proper— Why isn't Mr. Agent Bradley assisted by the opportunity to get all of his words in the record by answering the questions in writing? Because it seems like it would cure the incompleteness of the tape recording. It would benefit him, not hurt him. Actually, that was what he was concerned about. You said this on tape. He added this in writing. Were you lying to us then? Were you incomplete and less than candid then? Or is this something new that you thought to get you out of the situation? Why couldn't he say, I remember further details about the following aspect of the transaction, and so I'm able now in writing to give more details than I was able to give before? Why can't that be part of his answer? I suppose there's nothing legally that would stop that. I'm just arguing that that was not presented the way it was presented, and also the investigation as a whole was focusing on him rather than his backup who didn't show up, who actually was the one who let me. Why does that have any relevance? He's not charged in the case before us with mishandling the prisoner or the contraband. He's only charged with refusing to answer the written inquiry. So who cares how much fault may fall on the shoulders of the backup agent? That has nothing to do with the refusal to answer questions, does it? I can't see the connection. If they were investigating what happened and he gave a complete answer what happened, then I would agree with you. But if the complete answer wasn't on the record and the two people that were mentioned and not on the tape were his supervisor and his backup agent. One fact question. What was the time gap between the date of the tape-recorded interview and the date that he was asked to fill out the written affidavit? Minutes. He finished the tape interview. They said, here are the questions. Go into that room. Let's compute a fair answer. So minutes. It's not likely that he would have had time to reflect anymore. That's why I was saying so many of the questions were repetitive or things that he couldn't answer. Maybe it's a safeguard against the possible failure of the tape. That was not mentioned, Your Honor. All right. Well, we thank both counsel. I think we have the case squarely in view, and we'll take it under advisement.